**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

PSSI HOLDINGS, LLC,

      Plaintiff,

vs.                                                                          Civil Action No. _____

JEREMY SHANE CALHOUN,

      Defendant.

---

**COMPLAINT INCLUDING REQUEST FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION[1]**

Plaintiff PSSI Holdings, LLC ("PSSI" or "Plaintiff") seeks a temporary restraining order and preliminary injunction against Defendant Jeremy Shane Calhoun ("Defendant" or "Mr. Calhoun").  As grounds for the relief requested, PSSI states as follows:

**SUMMARY OF CLAIM**

1.      PSSI is North America's leading provider of contract sanitation and food safety services for food processing facilities.  Mr. Calhoun is PSSI's former Antimicrobial Director for PSSI's Chemical Innovations division.  Mr. Calhoun has resigned from his employment with PSSI and has commenced work for PSSI's direct competitor in a substantially similar position, in breach of his Noncompetition Agreement.

---

[1] As part of Defendant's employment with PSSI, Defendant agreed to a Mutual Arbitration Agreement that provides a carve-out for "an action by either party seeking a provisional remedy in any court of competent jurisdiction."  (*See* PSSI's Motion for Temporary Restraining Order, filed concurrently, at Ex. 6 to the Declaration of Tyler Courtney Cullers, Attach. A, § 2.)  Accordingly, PSSI seeks only temporary injunctive relief in this Court in anticipation of and in aid of commencing arbitration against Defendant for money damages, a permanent injunction, and other relief.  PSSI expressly preserves and does not waive the right to proceed in arbitration.

2.      In preparation to commence work for his employer's competitor, Mr. Calhoun exported an entire library of business file folders from his PSSI laptop computer to an external storage device and emailed from his company email account to his personal email account other PSSI confidential business information.  He then deleted the files and emails from PSSI's laptop computer and email account.  On information and belief, he deleted the files both to conceal his misappropriation of PSSI's confidential business information and to deprive PSSI of the ability to use the files in its business following his departure.

3.      Mr. Calhoun's bad faith threatens PSSI with serious competitive injury and loss of highly valuable trade secrets and confidential business information.  Accordingly, PSSI seeks immediate injunctive relief.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff PSSI is a limited liability company organized under the laws of the State of Delaware.  PSSI has its principal place of business in Kieler, Wisconsin.

5.      Defendant Jeremy Shane Calhoun is over the age of 18 years and resides in Mt. Pleasant, Texas.  His last known address is 521 FM 1735, Mount Pleasant, TX 75455.[2]

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves federal claims under the Defend Trade Secrets Act (18 U.S.C. § 1836) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).  This Court has supplemental jurisdiction over PSSI's claims for breach of contract and under the Texas Uniform Trade Secrets Act and the Texas Harmful Access to Computer Act, pursuant to 28 U.S.C. § 1367.

---

[2] Section 25 of Mr. Calhoun's Non-Competition Agreement specifies that Mr. Calhoun consents to receiving notice and service of process sent by reputable overnight courier service and a second copy sent by first-class mail, or by telecopy with a second copy sent by first-class mail. (*See* Ex. A.)

7.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because Mr. Calhoun resides in this judicial district and a substantial part of the events giving rise to this suit occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     PSSI's Food Safety and Sanitation Business

8.     PSSI is North America's industry leader in food safety and sanitation services and chemicals.  PSSI is organized into two principal divisions: PSSI Food Safety Solutions, which provides food safety and contract sanitation services, and PSSI Chemical Innovations, which develops, sells and implements cutting-edge food safety chemicals and methods and systems for their applications.  The two divisions work in partnership to provide comprehensive food safety and sanitation solutions.

9.     PSSI's customers are the owners and operators of food-processing and distribution facilities.  They rely on PSSI to keep their facilities clean and safe.  PSSI also provides water and wastewater conservation services for its customers.

10.    PSSI has a broad geographic market and provides products and services to hundreds of food processing plants across the United States and Canada.

### B.     Mr. Calhoun's Employment with PSSI

11.    Mr. Calhoun was employed with PSSI in its Chemical Innovations ("PCI") division as Antimicrobial Director.  As described in greater detail below, Mr. Calhoun was responsible for overseeing all aspects of PCI's antimicrobial products and services business, including research and development, procurement, customer services and support, and design and implementation of customer solutions for PSSI's entire customer base across the United States and Canada.

12.     Mr. Calhoun started work with PCI on or about October 1, 2018.  From the commencement of his employment, Mr. Calhoun was responsible for all field-based food safety related programs, including sanitation bacteria control program audits, bacteria identification processes and troubleshooting sanitation related food quality issues.

13.     Mr. Calhoun was the *only* person in this role for PSSI, and his geographic area of responsibility for his role was the entirety of the continental United States and Canada.  Mr. Calhoun reported directly to PCI President Doug Sharp and was part of PCI's executive leadership committee.

14.     Mr. Calhoun played a key role in business growth for PSSI, including both customer business development and identifying and evaluating businesses for potential acquisition by PSSI.  Mr. Calhoun also developed strong relationships with the food safety community, including both the government regulators and food safety inspectors and the private sector consultants who provide advice on regulatory compliance for food processors.  The consultants are an important business referral source for PSSI.

15.     Mr. Calhoun was also an integral part of strategic-level decision making while at PCI.  For example, Mr. Calhoun, in the period immediately prior to his departure, had been tasked with evaluating a specific supplier for potential acquisition by PSSI, in anticipation of PSSI soon making a confidential offer for the company under a nondisclosure agreement.

16.     Mr. Calhoun also had a significant customer-facing role.  He was deeply involved in developing and maintaining relationships with existing customers as well as preparing and presenting customer proposals for new projects.  He knows costs, pricing, and target profit margins and the strategies for cross-selling both the chemical and contract sanitation lines of business.  With current customers, Mr. Calhoun maintained relationships on behalf of PSSI with

both operational leadership at individual facilities and corporate leadership at customers' headquarters.

### C.   Mr. Calhoun's Restrictive Covenants

17.    Before beginning and in connection with his employment, Mr. Calhoun signed a Non-Competition Agreement on September 18, 2018, attached hereto as Exhibit A.  He also signed a New Team Member Checklist on October 1, 2018, an Acknowledge of Receipt of PSSI's Employee Handbook on October 2, 2018, a Confidentiality Agreement on October 2, 2018, a Company Property Agreement on October 3, 2018, and a Receipt and Acknowledgement of PSSI's Employee Handbook Training, in each instance thereby affirming multiple times his agreement to abide by PSSI's policies for the protection of its confidential information and trade secrets and limitations on use of its computers and other digital resources.

18.    In June 2020, Mr. Calhoun received a grant of an equity ownership interest in PSSI, at the time with a value net of taxes of approximately $10,000.  As a requirement to receive the equity grant, Calhoun affirmed his non-compete and confidentiality obligations by signing a Parent Common Unit Subscription Agreement, which reaffirmed his restrictive covenants.

### D.   Mr. Calhoun's Role in Technology Development and Product Innovation

19.    Mr. Calhoun's duties included overseeing the development and implementation of PSSI's technological innovations in antimicrobial chemicals and methods for their application and use.  For example, under Mr. Calhoun's leadership, PCI refined and implemented sophisticated, computer-controlled hydraulic systems for applying peracetic acid ("PAA").  Through his work, Mr. Calhoun learned PCI's confidential and proprietary operating parameters and contributed to further developing and refining those parameters for such factors as pressure, temperature, concentration, and volume flow that, with his substantial input, were encoded into

the system software.  He also was responsible for overseeing the budgeting, procurement, and installation of the systems at customer facilities, thereby gaining substantial know-how in the effective design and operation of PSSI's proprietary systems.  PSSI treated all of the foregoing information as confidential, protected by confidentiality agreements with employee and customer nondisclosure agreements.  PSSI derives a competitive advantage through the secrecy of this information because PSSI's know-how gives it an edge in providing sanitation and food safety services that exceed the performance of its competitors.

20.     As a second example, Mr. Calhoun was also instrumental in the development and implementation of innovations in the application of antimicrobial sanitizer chemicals and the use of a new antimicrobial product, Microbarrier Elite ("MBE").

21.     MBE is a revolutionary sanitation chemical.  Unlike traditional leaching sanitizers, which go onto a dirty surface and then clean the surface by neutralizing microbes already present, MBE is applied to a clean surface and acts as a barrier that prevents contamination by creating a surface that is resistant to microbial growth.

22.     Because MBE is such a novel approach to sanitization in the food industry, its application has required a significant amount of research and development to perfect the methods for its use in food safety and to collect data validating its efficacy.

23.     Led by Mr. Calhoun, PSSI invested substantial resources over approximately two years to refine the processes for using MBE in food-processing facilities, including how to apply it, how much to apply, how frequently to apply, how much cleaning is necessary before application, and how to test a surface on which it has been applied to demonstrate compliance with food safety standards.  Mr. Calhoun was crucial to this research and development process.

PSSI treated this information as confidential and protected it through employee and customer nondisclosure agreements.

24.     PSSI has an exclusivity agreement with the manufacturer of MBE, giving PSSI a substantial advantage over competitors who are unable to purchase MBE and are now years behind PCI in even beginning to learn how to use MBE.

25.     In addition to its use in food-processing plants, PSSI is also seeking to expand the applications for MBE.  Mr. Calhoun participated in exploring and developing these expanded MBE application opportunities and was intimately involved in PSSI's internal, confidential strategic planning process.

**E.     Mr. Calhoun's Departure from PSSI for the Vincit Group**

26.     On Sunday, May 2, 2021, Mr. Calhoun sent his two-week notice of resignation to Doug Sharp, PCI's President.  Although he remained on PSSI's payroll for the following two weeks, Calhoun was instructed not to report to work and to wait out his two weeks at home.

27.     On Thursday, May 6, 2021, PSSI revoked Mr. Calhoun's company network security credentials so that he could no longer use his PSSI login ID and password.

28.     On Thursday, May 13, 2021, PSSI employees met Mr. Calhoun in Mt. Pleasant, Texas, where he lives, and retrieved from him his company-issued laptop computer and iPhone.

29.     On June 1, 2021, the Vincit Group ("Vincit") announced that Mr. Calhoun had joined its subsidiary Zee Company.  The announcement stated:

> We are pleased to welcome Shane Calhoun to the Vincit Group family! Shane brings with him twenty years of experience within the food processing industry and dual degrees in biology and agriculture. As Vice President of Business Development for Zee Company, Shane will be working with our sanitation and anti-microbial partners to improve their processes, business, and bottom line.

30.     Vincit is a key competitor of PSSI, and Zee Company is the chemicals division of Vincit that competes directly with PCI.

31.     Mr. Calhoun's new role with Zee Company is substantially the same as his former role with PCI.

32.     Vincit and its subsidiaries are direct competitors of PSSI.  Zee Company is the Vincit subsidiary that corresponds in business model, products, and services to PCI.  Both are focused on providing chemical applications and solutions for food safety and sanitation for the same market of owners and operators of food processing facilities.

### F.    Mr. Calhoun's Misappropriation and Destruction of PSSI Computer Files Immediately Prior to His Resignation

33.     Mr. Calhoun's new position at Zee Company puts him in direct competition with PSSI in the same market for the same customers in the same industry providing competing services and products for the same customer needs.  By going to Zee Company, Mr. Calhoun has placed himself in a role that maximizes his opportunities to use his knowledge of PSSI's confidential business and technical information and his relationships with PSSI's customers to injure PSSI, misappropriate its trade secrets, confidential information and customer goodwill, and profit at PSSI's expense.

34.     In preparation for joining Zee Company, on April 30, 2021, and just three (3) days before sending his two-week notice, Mr. Calhoun exported from his PSSI laptop to an external storage device a library of folders of PSSI computer files containing the confidential business information and trade secrets of PSSI.

35.     Mr. Calhoun retained and did not turn over or disclose to PSSI the external storage device.

36.     Mr. Calhoun also permanently deleted substantially all of PSSI files on his PSSI laptop before he returned it to PSSI.  The files that he had copied onto the external storage device on April 30, 2021 were among the files that he then deleted from his PSSI-issued laptop.

37.     Mr. Calhoun had two motives in deleting the files.  First, by deleting them, he deprived PSSI of access to the files that he had created and used in his work for PSSI.  Second, he partially obscured the evidence that would have shown the extent of what he had misappropriated.

38.     Prior to his resignation, Mr. Calhoun also sent an unknown number of emails from his PSSI email address to a personal Yahoo email account and then deleted the emails from his company email account.

39.     Mr. Calhoun's misuse of PSSI's computer resources demonstrates Mr. Calhoun's intent to collect, retain, and use PSSI's confidential and trade secret information for the benefit of PSSI's competitor and to the detriment of PSSI, to deprive PSSI of continued access to the information in those same misappropriated computer files, and to conceal through the intentional destruction of evidence his misconduct undertaken with consciousness of wrongdoing.

## PLAINTIFF'S CLAIMS FOR RELIEF

### Count I
### Breach of Contract - Noncompetition Covenant

40.     Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 39 as though fully set forth herein.

41.     Mr. Calhoun signed and entered into a binding Non-Competition Agreement. Section 7 of the Non-Competition Agreement (the "Noncompetition Covenant") states as follows:

AGREEMENT NOT TO COMPETE.  Employee acknowledges that he has been hired by Employer to engage in Employer's Business and has and will, while engaged in Employer's Business, on a continuing basis, acquire knowledge of Employer's Trade Secrets and Confidential Business Information and has and will, on an ongoing basis, develop and strengthen relationships and goodwill with Employer's customers, consultants, vendors, and employees. Employee further acknowledges that his services have been and shall be of special, unique and

extraordinary value to Employer and that as a result of Employer's training of Employee and provision of Confidential Information and Trade Secrets to Employee, Employee could unfairly compete with Employer. In light of the foregoing, Employee agrees that, during Employee's employment with Employer and for two (2) years after the termination of such employment (collectively the "Restricted Period"), he will not, directly or indirectly, or in concert with others, whether as an employee, consultant, or independent contractor, offer, provide, or solicit the opportunity to provide any contract cleaning, sanitation, or related services within the Territory to any corporation, individual, enterprise, entity or association in the food industry, or otherwise engage in Employer's Business within the Territory. "Territory" shall mean (A) the area defined by a 50-mile radius around a Business Location, and (B) shall also include the entirety of any geographic territory or region for which the Employee has been assigned managerial, sales, or operational responsibilities at any time during the last two years of employment with Employer. Employee's "Business Location" shall include any customer facility for which Employee directly or indirectly supervised or managed the provision of any services on behalf of Employer at any time during the last two years of employment with Employer, and also any facility of a customer or prospective customer for which Employee assisted Employer to prepare, submit, or present a bid or proposal at any time during the last two years of employment with Employer. To the extent Employee is hereafter appointed by Employer to a position of general corporate responsibility for business activities that are not limited to any specific region or territory, "Territory" shall include all of the continental United States and Canada.

42.     The Noncompetition Covenant is reasonable and enforceable.

43.     The Noncompetition Covenant is ancillary to an otherwise enforceable agreement:  As consideration for the parties' agreement, PSSI agreed to give Mr. Calhoun specialized training, provide Mr. Calhoun access to confidential information and trade secrets, and introduce Mr. Calhoun to customers in need of food safety and sanitation services and products.  This consideration offered by PSSI was PSSI's most valuable resource; it was difficult and expensive to obtain, desired by competitors, and at the core of PSSI's success.

44.     In addition, PSSI granted Mr. Calhoun equity units in consideration for and conditioned upon his affirmation of his noncompete obligations to PSSI.

45.     The damage to PSSI's business if its former employees used its confidential information, and trade secrets and customer goodwill to compete with it is immeasurable.

Consequently, PSSI needed to protect its employee training, confidential information and trade secrets, and client contacts and good will from competitors.  Accordingly, PSSI required Mr. Calhoun to agree to the Noncompetition Covenant.

46.     The restraint created by the Noncompetition Covenant is also reasonably limited in scope and narrowly tailored so that it is no greater than necessary to protect PSSI's legitimate interests.  The time limitation is only two years, a reasonable period of time, and is limited to the same geographic area as the actual territory for which Mr. Calhoun was actually responsible.

47.     Mr. Calhoun is intentionally and knowingly breaching the Noncompetition Covenant of the Non-Competition Agreement by commencing employment with Vincit and Zee Company to provide in competition with PSSI substantially the same services as he previously provided PSSI.

48.     Mr. Calhoun's breach of the Noncompetition Covenant has caused PSSI to suffer substantial harm.

49.     Upon information and belief, Mr. Calhoun will continue to breach the Noncompetition Covenant unless enjoined by this Court.

50.     Mr. Calhoun's breach of the Noncompetition Covenant of the Non-Competition Agreement has caused and will cause imminent and irreparable harm to PSSI for which there is no adequate remedy at law unless Mr. Calhoun is enjoined from any further breaches of the Noncompetition Covenant.

51.     Any conditions precedent to PSSI's right to enforce the Noncompetition Covenant of the Non-Competition Agreement have occurred.

**Count II**
**Breach of Contract – Nondisclosure Covenants**

52.     Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 51 as though fully set forth herein.

53.     Mr. Calhoun signed and entered into a binding Non-Competition Agreement, which contains in sections 3 and 4 valid and enforceable confidentiality and trade secrets covenants (collectively, the "Nondisclosure Covenants").

54.     Section 3 states as follows:

CONFIDENTIAL BUSINESS INFORMATION.  Employee agrees not to use, disclose or exploit any Confidential Business Information belonging to Employer, or provided to Employer by a third party pursuant to an obligation of confidentiality, except as necessary to perform Employee's duties on behalf of Employer or as required by law, whether or not such information is designated as "confidential." The obligations stated in this Paragraph 3 shall survive the termination of this Agreement and/or the termination of Employee's employment with Employer and shall continue for so long as such data or information meets the definition of Confidential Business Information as stated below, but in no event longer than five (5) years after termination of such employment, unless such Confidential Business Information shall also constitute a Trade Secret under Paragraph 4 below. Employee further agrees to take all appropriate action, whether by instruction, agreement or otherwise, to insure the protection, confidentiality and security of all Confidential Business Information. For purposes of this Agreement, "Confidential Business Information" means any information (a) relating to the business of Employer, (b) disclosed to Employee or of which Employee is aware due to his employment with Employer, (c) that has value to Employer, (d) that is not generally known to competitors of Employer, and (e) includes without limitation client information, accounts, trade secrets, procedures, manuals, financial information, investment research, contracts, accounting and computer practices, office policies and practices, portfolio recommendations, buy-list construction, internal reports, Salesforce data, tableau data, as well as any other non-public information regarding Employer's services. Provided however, that Confidential Business Information shall not include data or information (x) that has been voluntarily disclosed to the public by Employer (although not by Employee without authorization of Employer), (y) that has been independently developed and disclosed by others with proper authority to do so, or (z) that has otherwise entered the public domain through lawful means. Confidential Business Information may also include, without limitation, information relating to Employer's: actual or potential client information and lists, actual or potential employee information and lists, designs, compilations,

programs, methods, techniques, drawings, processes, research and development, distribution systems, legal affairs, accounting, customer preferences, billing rates, pricing practices, marketing strategies, business plans (including merger and acquisition targets), strategic plans, margins, prices, operations, existing and future services, contract expiration dates, forecasts and forecast assumptions and volumes, and other financial, sales, marketing, services, and operations information, whether written or otherwise. Employee's agreement to protect Confidential Business Information belonging to Employer extends to instances in which Employee is using non-Employer computer resources, such as personal e-mail, internet or intranet and instant messaging accounts, as well as computer equipment and smart phones not owned by Employer. Employee further agrees to report immediately to Employer any incident that may compromise or has compromised Confidential Business Information, including, without limitation, the loss or theft of any hard copy of such information, any disk or drive containing such information, and any laptop or desktop computer, whether Employer-owned or otherwise, containing such information. Employee agrees to abide by and follow all Employer-mandated standards relating to the creation, maintenance, use, and preservation of the confidentiality of passwords and encryption methods for protecting Confidential Business Information. Unauthorized use or disclosure of Confidential Business Information may result in discipline, up to and including immediate termination, prosecution, or other available action. Neither this paragraph nor any other provision of this Agreement is intended to limit in any way Employee's right to discuss the terms and conditions of employment.

55.     Section 4 states as follows:

TRADE SECRETS.  Employee agrees not to use or disclose any Trade Secret of Employer at any time during or after his employment without Employer's prior written consent. "Trade Secret" means information, without regard to form, that constitutes a formula, pattern, compilation, program, device, method, technique or process which: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

56.     The Nondisclosure Covenants are reasonable and enforceable.

57.     The Nondisclosure Covenants are ancillary to an otherwise enforceable agreement:  As consideration for the parties' agreement, PSSI agreed to give Mr. Calhoun specialized training, provide Mr. Calhoun access to confidential information and trade secrets, and introduce Mr. Calhoun to customers in need of food safety and sanitation services and

products.  This consideration offered by PSSI was PSSI's most valuable resource; it was difficult and expensive to obtain, desired by competitors, and at the core of PSSI's success.

58.    The damage to PSSI's business if its former employees retained and used its confidential information and trade secrets to compete with it is immeasurable.  Consequently, PSSI needed to protect its employee training, confidential information, and trade secrets from competitors.  Accordingly, PSSI required Mr. Calhoun to agree to the Nondisclosure Covenants.

59.    The restraint created by the Nondisclosure Covenants is also reasonably limited in scope and narrowly tailored and no greater than necessary to protect PSSI's legitimate interests.

60.    Upon information and belief, Mr. Calhoun has used and divulged—and intends to continue to use and divulge—the confidential business information and trade secrets of PSSI, all in breach of the Nondisclosure Covenants.

61.    Upon information and belief, unless enjoined, Mr. Calhoun will continue his wrongful use of confidential business information and trade secrets of PSSI.

62.    Mr. Calhoun's breach of the Nondisclosure Covenants has caused PSSI to suffer substantial harm.

63.    Upon information and belief, Mr. Calhoun will continue to use and/or disclose PSSI's trade secrets and confidential business information unless enjoined by this Court.

64.    Mr. Calhoun' breach of the Nondisclosure Covenants has caused and will cause imminent and irreparable harm to PSSI for which there is no adequate remedy at law unless Mr. Calhoun is enjoined from any further breaches of the Nondisclosure Covenants.

65.    Any conditions precedent to PSSI's right to enforce the Nondisclosure Covenants have occurred.

## Count III
## Breach of Contract – Return of Property Covenant

66.     Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 65 as though fully set forth herein.

67.     Mr. Calhoun signed and entered into a binding Non-Competition Agreement. Section 15 of the Non-Competition Agreement (the "Return of Property Covenant") states as follows:

> RETURN OF EMPLOYER PROPERTY AND INFORMATION.  Immediately upon termination of Employee's employment for any reason, or at any other time that Employer requests in writing, Employee shall return to Employer all materials, information, property and equipment of Employer in the possession or under control of Employee including, without limitation, any and all Confidential Business Information and Trade Secrets and copies or derivatives thereof, any electronic storage device or media on which any Confidential Business Information and/or Trade Secrets have at any time been stored, including, without limitation, hard drives, portable drives, thumb drives, disks or other storage devices, computer equipment, computer files, audio/video tape recordings, records, documents, drawings, specifications, lists, equipment and supplies, promotional materials, scripts and similar items relating to the business of Employer, and all copies thereof or extracts therefrom. Employee agrees that he shall not retain any lists, notes or records of the names, contact information or preferences or requirements of any customers of Employer or any of Employer's employees.

68.     The Return of Property Covenant is reasonable and enforceable.

69.     The Return of Property Covenant is ancillary to an otherwise enforceable agreement:  As consideration for the parties' agreement, PSSI agreed to give Mr. Calhoun specialized training, provide Mr. Calhoun access to confidential information and trade secrets, and introduce Mr. Calhoun to customers in need of food safety and sanitation services and products.  This consideration offered by PSSI was PSSI's most valuable resource; it was difficult and expensive to obtain, desired by competitors, and at the core of PSSI's success.  In addition, PSSI furnished Mr. Calhoun with a laptop computer, iPhone, and other devices and access to

PSSI's computer network and resources in reliance on Mr. Calhoun's promise to comply with the Return of Property Covenant.

70.     The damage to PSSI's business if its former employees retained and used its confidential information and trade secrets to compete with it is immeasurable.  Consequently, PSSI needed to protect its employee training, confidential information, and trade secrets from competitors.  Accordingly, PSSI required Mr. Calhoun to agree to the Return of Property Covenant.

71.     The restraint created by the Return of Property Covenant is also reasonably limited in scope and narrowly tailored so that it is no greater than necessary to protect PSSI's legitimate interests.  It requires Mr. Calhoun to return PSSI's own property to PSSI at the conclusion of his employment.

72.     Mr. Calhoun is intentionally and knowingly breaching the Return of Property Covenant by retaining PSSI's confidential business information and trade secrets.

73.     Mr. Calhoun' breach of the Return of Property Covenant has caused PSSI to suffer substantial harm.

74.     Upon information and belief, Mr. Calhoun will continue to breach the Return of Property Covenant unless enjoined by this Court.

75.     Mr. Calhoun's breach of the Return of Property Covenant has caused and will cause imminent and irreparable harm to PSSI for which there is no adequate remedy at law unless Mr. Calhoun is enjoined from any further breaches of the Return of Property Covenant.

76.     Any conditions precedent to PSSI's right to enforce the Return of Property Covenant have occurred.

**Count IV**
**Misappropriation of Trade Secrets – Texas Uniform Trade Secrets Act**
**Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.**

77.     Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 76 as though fully set forth herein.

78.     During his employment with PSSI, Mr. Calhoun had access to, reviewed, and used certain trade secrets of PSSI.  This information is economically valuable and not generally known to the public, and PSSI has expended substantial time, money, and effort in developing such information for business use and to obtain a competitive advantage.

79.     PSSI takes reasonable measures to maintain the secrecy of this information.  For example, PSSI required that Mr. Calhoun sign the Non-Competition Agreement containing confidentiality and non-disclosure covenants.  In addition, access to the information was and continues to be restricted through handbook policies and company practices including computer security measures such as passwords.  Any part of the information shared with a customer was disclosed under the protection of a nondisclosure agreement.

80.     Accordingly, the various items of information described above constitute trade secrets within the meaning of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.

81.     Upon information and belief, Mr. Calhoun has used and disclosed and will use and disclose, unless enjoined, PSSI's trade secrets that PSSI has expended significant time and expense in creating and protecting, and which are not known to others outside of PSSI.

82.     Upon information and belief, Mr. Calhoun will regularly have the opportunity to use PSSI's trade secrets during the course of his employment with Vincit and Zee Company.

83.     Upon information and belief, Mr. Calhoun will continue to use and/or disclose PSSI's trade secrets unless enjoined by this Court.

84.     Although the extent of Mr. Calhoun's trade secret misappropriation is unknown at this time because he deliberately destroyed electronic evidence in an attempt to conceal his wrongful acts, the information known to PSSI shows that Mr. Calhoun copied and retained substantial files concerning the MBE program.  On information and belief, these files include PSSI's trade secret information concerning its research and development to devise methods for the effective use of MBE in food safety applications and to validate the efficacy of MBE, together with the extensive field data, sampling, testing, and analysis PSSI collected and performed in connection with these efforts.

85.     The retention, disclosure, and use of such information by Mr. Calhoun constitute a misappropriation of PSSI's trade secrets and confidential business information in violation of Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.

86.     As a result of Mr. Calhoun's conduct, PSSI has suffered damages, including, but not limited to, loss of competitive advantage, the reduction of value of the confidential information and trade secrets, loss of the exclusive use of the confidential information and trade secrets, and loss of potential profits.

87.     PSSI has suffered and will continue to suffer irreparable harm as the result of Mr. Calhoun's misappropriation of its trade secrets.  The recovery of money damages would not fully compensate PSSI. Accordingly, this Court may enjoin Mr. Calhoun from using or disclosing PSSI's trade secrets.

**Count V**
**Misappropriation of Trade Secrets – Federal Defend Trade Secrets Act**
**18 U.S.C. § 1836**

88.     Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 87 as though fully set forth herein.

89.     During his employment with PSSI, Mr. Calhoun had access to, reviewed, and used certain trade secrets of PSSI that relate to a product and services used in both interstate and foreign commerce.  This information is economically valuable and not generally known to the public, and PSSI has expended substantial time, money, and effort in developing such information for business use and to obtain a competitive advantage.

90.     PSSI takes reasonable measures to maintain the secrecy of this information.  For example, PSSI required that the Mr. Calhoun sign the Non-Competition Agreement containing confidentiality and non-disclosure covenants.  In addition, access to the information was and continues to be restricted through handbook policies and company practices including computer security measures such as passwords.  Any part of the information shared with a customer was disclosed under the protection of a nondisclosure agreement.

91.     Accordingly, the various items of information described above constitute trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

92.     Upon information and belief, Mr. Calhoun has used and disclosed and will use and disclose, unless enjoined, PSSI's trade secrets that PSSI has expended significant time and expense in creating and protecting, and which are not known to others outside of PSSI.

93.     Upon information and belief, Mr. Calhoun will regularly have the opportunity to use PSSI's trade secrets during the course of his employment with Vincit and Zee Company.

94.     Upon information and belief, Mr. Calhoun will continue to use and/or disclose PSSI's trade secrets unless enjoined by this Court.

95.     Although the extent of Mr. Calhoun's trade secret misappropriation is unknown at this time because he deliberately destroyed electronic evidence in an attempt to conceal his wrongful acts, the information known to PSSI shows that Mr. Calhoun copied and retained substantial files concerning the MBE program.  On information and belief, these files include PSSI's trade secret information concerning its research and development to devise methods for the effective use of MBE in food safety applications and to validate the efficacy of MBE, together with the extensive field data, sampling, testing, and analysis PSSI collected and performed in connection with these efforts.

96.     MBE is a product used—and often coupled with PSSI services—in both interstate and foreign commerce.

97.     The retention, disclosure, and use of such information by Mr. Calhoun constitute a misappropriation of PSSI's trade secrets and confidential business information in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

98.     As a result of Mr. Calhoun's conduct, PSSI has suffered damages, including, but not limited to, loss of competitive advantage, the reduction of value of the confidential information and trade secrets, loss of the exclusive use of the confidential information and trade secrets, and loss of potential profits.

99.     PSSI has suffered and will continue to suffer irreparable harm as the result of Mr. Calhoun's misappropriation of its trade secrets.  The recovery of money damages would not fully compensate PSSI. Accordingly, this Court may enjoin Mr. Calhoun from using or disclosing PSSI's trade secrets.

**Count VI**
**Unauthorized Access to Protected Computer – Federal Computer Fraud and Abuse Act**
**18 U.S.C. § 1030**

100.    Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 99 as though fully set forth herein.

101.    Prior to April 30, 2021, Mr. Calhoun maintained on his PSSI laptop computer a library of PSSI business files.  The files were organized in a series of separate folders.  Each folder was a separate and distinct container of files in the Windows software operating environment.  Mr. Calhoun was authorized to open the folders and access the files stored within them by virtue of his employment with PSSI.

102.    On April 30, 2021, in preparation for his resignation from PSSI, Mr. Calhoun connected an external storage device to his PSSI laptop and selectively transferred some of the PSSI folders to this external drive.

103.    The external storage device has been and, on information and belief continues to be, used in interstate commerce.

104.    Mr. Calhoun no longer has any authorized access to the folders.  Under the terms of his Non-Competition Agreement, Mr. Calhoun was required to cease any use or disclosure of the contents and to return the folders to PSSI.

105.    PSSI took affirmative steps to deprive Mr. Calhoun of access to PSSI's files.  On or about May 6, 2021, PSSI revoked Mr. Calhoun's company network security credentials before his formal separation from the company so that he could no longer use his PSSI login ID and password.  On or about May 13, 2021, PSSI retrieved the PSSI laptop from Mr. Calhoun.

106.    At present, Mr. Calhoun is not authorized to access *any* PSSI electronically stored information.  Any authorization Mr. Calhoun may have ever had terminated when PSSI revoked

his authorized access and he was under a contractual obligation to return all company property, including the devices from which he had transferred PSSI's folders and files prior to resigning.

107.    On information and belief, Mr. Calhoun exported the PSSI folders to the external storage device and retained them following his resignation with the intent to obtain unauthorized access to the folders and their contents following the termination of his employment.

108.    PSSI has suffered and will continue to suffer irreparable harm as the result of Mr. Calhoun's unauthorized access to PSSI folders and their contents.  The recovery of money damages would not fully compensate PSSI.

109.    Upon information and belief, Mr. Calhoun has and will continue to access intentionally and without authorization the folders and their contents, unless enjoined, in violation of 18 U.S.C. § 1030.

110.    Mr. Calhoun has caused PSSI to incur a loss in excess of $5,000 to investigate, attempt to identify, recover, and remediate the misappropriated files and their contents.

## Count VII
### Harmful Computer Access Without Consent – Texas Harmful Access by Computer Act
### Tex. Civ. Prac. & Rem. Code § 143.001

111.    Plaintiff refers to and incorporates herein by reference the allegations set forth in paragraphs 1 through 110 as though fully set forth herein.

112.    On April 30, 2021, Mr. Calhoun accessed his PSSI laptop computer by connecting a non-PSSI external storage device to the PSSI laptop and selectively retrieving containers of electronic files that were stored on the PSSI laptop and which contain PSSI's sensitive business information.

113.    After removing these PSSI files from the PSSI laptop to his external storage device, Mr. Calhoun deliberately and permanently deleted the very same files on the PSSI laptop.

114.    Mr. Calhoun transferred the files without a legitimate business purpose.

115.    PSSI did not consent to Mr. Calhoun's transfer of its files from the PSSI laptop to Mr. Calhoun's external storage device.

116.    On May 6, 2021, PSSI revoked Mr. Calhoun's company network security credentials before his formal separation from the company so that he could no longer use his PSSI login ID and password.

117.    On May 13, 2021, Mr. Calhoun met with PSSI employees to return all of his PSSI electronic equipment, including—as required by section 15 of the Non-Competition Agreement—"all materials, information, property and equipment of [PSSI] in the possession or under control of [Mr. Calhoun]." This includes, without limitation, the PSSI files that Mr. Calhoun copied onto his external storage device.

118.    Although Mr. Calhoun turned over the PSSI laptop and PSSI iPhone, he retained the external storage device onto which he had transferred the PSSI files.

119.    Mr. Calhoun's retention of PSSI files beyond his term of employment exceeds any consent he had ever received from PSSI.

120.    There is no legitimate business purpose for Mr. Calhoun to retain PSSI files on his external storage device.

121.    PSSI did not consent to Mr. Calhoun's retention of its files on Mr. Calhoun's external storage device.

122.    Because of Mr. Calhoun's extensive deletion of files on the PSSI laptop, further investigation and discovery are necessary to determine the full scope of the files that he took.

123.    Mr. Calhoun's unauthorized copying and retention of PSSI files has caused and will continue to cause PSSI damages.

124.    While employed by a direct competitor, Mr. Calhoun is in possession of PSSI files that he took and holds without the consent of PSSI and in direct contravention of his Non-Competition Agreement.  PSSI will be imminently and irreparably harmed by such unauthorized access to these files.  On information and belief, Mr. Calhoun has accessed and will continue to access the folders and their contents unless enjoined by this Court.

125.    Additionally, Mr. Calhoun has caused PSSI to incur substantial expense to investigate, attempt to identify, recover, and remediate the misappropriated files and their contents, which has resulted in damages.

## **REQUEST FOR RELIEF**[3]

For all these reasons, Plaintiff respectfully requests the entry of a temporary restraining order followed by entry of a preliminary injunction enjoining and restraining Defendant from further breaches of the Noncompetition, Confidentiality, and Return of Property Covenants in the Non-Competition Agreement and from further violations of the Texas Uniform Trade Secrets Act, the federal Defend Trade Secrets Act, the federal Computer Fraud and Abuse Act, and the Texas Harmful Access by Computer Act through and until a final award is issued by an arbitrator appointed in accordance with the parties' Arbitration Agreement, and for such other and further relief to which Plaintiff may be entitled.

---

[3] Plaintiff seeks only temporary injunctive relief in this Court in anticipation of and in aid of commencing arbitration against Defendant for money damages, a permanent injunction, and other relief described above. *See* fn. 1.  Plaintiff's Motion for Temporary Restraining Order is being filed contemporaneously with this Complaint.

Respectfully submitted,

*/s/ Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
J. Randy Roeser
Texas Bar No. 24089377
Haltom & Doan
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: 903.255.1000
Facsimile: 903.255.0800
Email: jdoan@haltomdoan.com

*Of Counsel*
*(pro hac vice application pending)*
Matthew F. Prewitt
mprewitt@schiffhardin.com
Sarah K. Angelino
sangelino@schiffhardin.com
Schiff Hardin LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: 312.258.5500

*Attorneys for Plaintiff*